## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**LEROY FORTADO, SR.**                         **CIVIL ACTION**

**VERSUS**                                     **NO: 22-1518**

**EVONIK CORPORATION ET AL.**                  **SECTION: H**

## ORDER AND REASONS

Before the Court is Defendant Shell Oil Company's Motion to Dismiss (Doc. 5). Also before the Court is Defendant Evonik Corporation's Rule 12(b)(6) Motion to Dismiss or, Alternatively, Rule 12(e) Motion for a More Definite Statement (Doc. 12). For the following reasons, these Motions are **DENIED**.

## BACKGROUND

This case arises out of alleged exposure to the odorless, colorless gas ethylene oxide ("EtO") near a petrochemical plant in Reserve, Louisiana ("the Facility"), owned and operated by Defendants, Evonik Corporation ("Evonik") and Shell Oil Company ("Shell"). Shell owned and operated the Facility from 1991 to 1999, and Evonik has owned and operated it since. Plaintiff Leroy Fortado, Sr., individually and on behalf of his deceased wife, Mary Ann Fortado, alleges that emissions of EtO from the Facility caused Mrs. Fortado's

breast cancer and subsequent death in 2018. Plaintiff also seeks damages for his own "fear and increased likelihood of development of cancer and other fatal and debilitating diseases."[1]

## I.    Procedural History

Originally, this suit consisted of 14 plaintiffs. The plaintiffs were Louisiana residents who lived within seven miles of the Facility and had either contracted cancer or had a spouse die from cancer, allegedly because of unknowing exposure to dangerous levels of EtO emitted by the Facility. On April 26, 2021, the plaintiffs filed suit in the Civil District Court for the Parish of St. John the Baptist, alleging that inhalation of EtO from the Facility was a substantial factor in causing their or their spouses' cancer. Subsequently, Evonik removed the case to this Court under diversity jurisdiction.

Defendants each filed motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the plaintiffs' claims were time-barred because suit was filed after the expiration of the applicable one-year prescriptive period. Defendants also argued that the plaintiffs failed to state claims for negligence, battery, or nuisance under Louisiana law.

The Court granted Shell's motion to dismiss on the grounds of prescription and the inapplicability of the doctrine of *contra non valentem*.[2] The claims against Shell were dismissed without prejudice, allowing the plaintiffs to amend their complaint to plead facts, specific to each plaintiff, to

---

[1] Doc. 2, ¶ 83.

[2] Ellis v. Evonik Corp., No. 21-1089, 2022 WL 1719196, at *8 (E.D. La. May 27, 2022) (Vance, J.).

support the application of *contra non valentem*.[3] As to Evonik's motion, the Court granted in part, dismissing the battery claims with prejudice and the negligence claims without prejudice.[4] The Court found that the plaintiffs had alleged no specific standard of care with which Evonik must comply but they could amend their complaint to include as much.[5] Evonik's motion with respect to the continuing-tort claims under Louisiana's vicinage articles, Civil Code articles 667 to 669 was denied.[6] Finally, noting the significant factual differences between the plaintiffs in terms of the nature and duration of their exposure and their types of cancer, the Court severed the case into 14 distinct civil actions.[7]

Plaintiff's action was allotted to this Court, and he subsequently filed his Amended Complaint pursuant to the Court's Order and Reasons.[8]

## II.   Factual Background

The facts, as alleged in Plaintiff's Amended Complaint, are as follows. EtO is an odorless, colorless gas used to make a range of products, including antifreeze, textiles, plastics, detergents and adhesives.[9] EtO is one of 187 pollutants that EPA has classified as "hazardous air pollutants" or "air toxics."[10] "Scientific and industry studies show that long-term exposure to EtO increases the risk of cancers of the white blood cells[ ] including, but not limited

---

[3] *Id.*
[4] *Id.* at *16.
[5] *Id.*
[6] *Id.*
[7] *Id.* at *14.
[8] *See* Doc. 2.
[9] *Id.* at ¶¶ 18, 20.
[10] *Id.* at ¶ 21.

to, non-Hodgkin lymphoma, myeloma, lymphocytic leukemia, and breast cancer."[11] The World Health Organization and various federal agencies have classified EtO as a carcinogen.[12]

The Facility has emitted large volumes of EtO gas for several decades.[13] The EtO emitted by the Facility remains in the air for months, becomes concentrated in atmospheric inversions, and moves through neighboring communities via prevailing winds.[14] Because its half-life in the atmosphere is 211 days, EtO remains in the air near the Facility long after it has been emitted.[15]

The Facility releases state-authorized amounts of EtO into the atmosphere, which are nevertheless dangerous to persons working and living near the Facility, as set forth in greater detail below.[16] The Facility also releases unauthorized amounts of EtO into the air and water.[17] Such unauthorized releases are called "fugitive releases," and they are caused by undetected and unrepaired leaks and faulty equipment, among other things.[18] Fugitive EtO emissions from the Facility have dramatically increased the volume of EtO in the atmosphere around the Facility and in the surrounding community,

> including just by way of example, multiple unauthorized releases of EtO in 2012 and 2013 that may have led to as much as 1950 lbs.

---

[11] *Id.* at ¶ 22.
[12] *Id.* at ¶¶ 26–35.
[13] *Id.* at ¶ 36.
[14] *Id.* at ¶ 37.
[15] *Id.*
[16] *Id.* at ¶ 40.
[17] *Id.*
[18] *Id.*

of EtO being released into the atmosphere according to the facility, which is approximately the same amount of planned emissions that were released those years such that the fugitive emissions doubled the amount of EtO in the air.[19]

In August 2018, the Environmental Protection Agency ("EPA") released the results of the 2014 National Air Toxics Assessment ("2014 NATA").[20] The 2014 NATA estimated concentrations of airborne toxins and population exposure, and it calculated the associated risks of cancer and other serious health problems.[21] The assessment revealed that individuals living in census tracts around the Facility, including Plaintiff, have some of the highest risks of cancer from EtO exposure in the country.[22]

The 2014 NATA results were not communicated in any way to the citizens of St. John the Baptist Parish.[23] The EPA Office of Inspector General ("OIG") issued a management alert in March 2020 that directed the EPA and state and local officials to provide information about EtO to impacted residents who faced increased and "unacceptable" risks of cancer from certain facilities' EtO emissions, specifically including the Evonik Facility.[24] The 2020 OIG alert further called on the EPA to conduct risk assessments of the identified facilities, including Evonik's, and to develop new emissions standards for facilities emitting EtO that are creating unreasonable risks for surrounding

---

[19] *Id.*
[20] *Id.* at ¶ 41.
[21] *Id.*
[22] *Id.*
[23] *Id.* at ¶ 42.
[24] *Id.*

communities.[25] The EPA's assessment confirmed that individuals living near the Evonik Facility have a risk of developing cancer that is eight times what the EPA considers to be "acceptable."[26]

Despite the OIG's 2020 alert, there was no public awareness initiative or campaign by the defendants or any government agency to educate the community until August 21, 2021, when the first public outreach meeting was organized by the EPA to inform local residents they face an increased risk of developing cancer from Evonik's EtO emissions.[27] At that meeting, the EPA explained that, notwithstanding the fact that Evonik has decreased its EtO emissions from 2014 to 2020 by nearly 50%, the levels emitted were still not "sufficiently protective of human health" according to EPA guidelines and standards, even though they were within permitted limits, pursuant to state law.[28]

With respect to Evonik's claimed reduction in levels of EtO emissions from 2014 to 2020, the decrease in EtO emitted into the ambient air was mostly attributable to the Facility reducing "fugitive" EtO emissions, i.e., unplanned emissions caused by leaks in equipment, faulty processes, and accidents.[29] According to the EPA, Evonik was able to reduce unplanned fugitive emissions by 92% from 2014 to 2020, mostly as a result of improvements to the Facility's mandated leak detection and repair program ("LDAR").[30]

---

[25] *Id.*
[26] *Id.*
[27] *Id.* at ¶¶ 42–43.
[28] *Id.* at ¶ 44.
[29] *Id.* at ¶ 45.
[30] *Id.*

Plaintiff has lived within six miles of the Facility since 1993, and he continues to do so.[31] Plaintiff's wife lived with him at this location from 1993 to 2018, when she died from breast cancer.[32] Relevant to the issues presented in Defendants' Motions, Plaintiff alleges as follows:

> No physician ever advised Mr. or Mrs. Fortado that Mrs. Fortado's cancer may have been caused by exposure to EtO . . . . The Fortados did not know anything about EtO to ask the physicians any questions about Mrs. Fortado's exposure, which was also unknown to them at the time, and cancer. Mr. and Mrs. Fortado did not know that Plaintiff was exposed to dangerous amounts of EtO since it is colorless and odorless, and Defendants have never advised the general public of the dangers of EtO. Mr. and Mrs. Fortado also had no knowledge of the operation of the facility at any time, did not know that it emitted EtO, and did not know that the emissions of EtO were subject to regulation and the subject of scientific studies. Neither Mr. nor Mrs. Fortado have ever had any education related to chemistry beyond high school studies. Mr. and Mrs. Ellis [sic] did not know how to research information related to operation of the facility even if they wanted to do so and were self-described "computer illiterate." The first time Mr. Fortado had any reason to think that EtO emission from the facility was a substantial factor in causing Mrs. Fortado's cancer and death was when Mr. Fortado received an advertisement in the mail from The Voorhies Law Firm on or after April 28, 2020. . . . The receipt of the advertisement was the first time Mr. Fortado ever knew of the existence of EtO. . . . Thereafter Mr. Fortado took reasonable steps to investigate whether exposure to EtO had caused Mrs. Fortado's cancer or created a risk of future cancer for Mr. Fortado. Mr. Fortado filed this action within one year of learning facts supporting that he had a cause of action against Defendants.[33]

---

[31] *Id.* at ¶¶ 1, 10, 55.
[32] *Id.* at ¶¶ 1, 55.
[33] *Id.* at ¶ 55.

Now before the Court are Shell's Motion to Dismiss and Evonik's Rule 12(b)(6) Motion to Dismiss or, Alternatively, Rule 12(e) Motion for a More Definite Statement.[34] Plaintiff opposes.[35] Because the Motions raise overlapping issues, the Court will consider them together.

## LEGAL STANDARDS

### I.   12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough facts "to state a claim to relief that is plausible on its face."[36] A claim is "plausible on its face" when the pleaded facts allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."[37] A court must accept the complaint's factual allegations as true and must "draw all reasonable inferences in the plaintiff's favor."[38] However, the Court need not accept as true legal conclusions couched as factual allegations.[39]

To be legally sufficient, a complaint must establish more than a "sheer possibility" that the plaintiff's claims are true.[40] "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" will not suffice.[41] Rather, the complaint must contain enough factual

---

[34] Docs. 5, 12.
[35] Docs. 8, 13.
[36] Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).
[37] *Id.*
[38] Lormand v. U.S. Unwired, Inc., 565 F.3d 228, 232 (5th Cir. 2009).
[39] *Iqbal*, 556 U.S. at 678.
[40] *Id.*
[41] *Id.* (quoting *Twombly*, 550 U.S. at 555).

allegations to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim.[42]

## II.   12(e)

A district court will grant a motion for a more definite statement under Rule 12(e) when the challenged pleading "is so vague or ambiguous that the [moving] party cannot reasonably prepare a response."[43] The moving party "must point out the defects complained of and the details desired."[44]

"When evaluating a motion for a more definite statement, the Court must assess the complaint in light of the minimal pleading requirements of Rule 8."[45] Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[46] "Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."[47] In light of the liberal pleading standard set forth in Rule 8(a), Rule 12(e) motions are disfavored.[48] Motions for a more definite statement are generally granted only when the complaint is "so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to

---

[42] *Lormand*, 565 F.3d at 255–57.

[43] FED. R. CIV. P. 12(e).

[44] *Id.*

[45] Babcock & Wilcox Co. v. McGriff, Siebels & Williams, Inc., 235 F.R.D. 632, 633 (E.D. La. 2006).

[46] FED. R. CIV. P. 8(a)(2).

[47] Erickson v. Pardus, 551 U.S. 89, 93 (2007) (internal quotation marks and citations omitted).

[48] JNP Enters., LLC v. Patterson Structural Moving & Shoring, LLC, No. 13-4684, 2014 WL 31650, at *1–2 (E.D. La. Jan. 3, 2014) (first citing Mitchell v. E–Z Way Towers, Inc., 269 F.2d 126, 132 (5th Cir. 1959); and then citing Who Dat Yat Chat, LLC v. Who Dat, Inc., No. 10–1333, 2012 WL 2087439, at *6 (E.D. La. June 8, 2012)).

answer it."[49] This Court "has considerable discretion in deciding whether to grant a Rule 12(e) motion."[50]

## LAW AND ANALYSIS

The questions before the Court are as follows: (1) whether Plaintiff's claims have prescribed; (2) whether Plaintiff's amended general negligence allegations state a specific standard of care and a breach of that standard; (3) whether Evonik is entitled to a more definite statement as to its alleged breaches; and (4) whether Plaintiff has stated a claim under the vicinage articles. The Court will consider each issue in turn.

### I.   Prescription

Both Defendants argue that Louisiana's one-year prescriptive period for delictual actions bars all of Plaintiff's claims.[51] Plaintiff counters that the doctrine of *contra non valentem* suspended the prescriptive period as to Shell and Evonik.[52]

Article 3492 of the Louisiana Civil Code provides that "[d]elictual actions are subject to a liberative prescription of one year." This period "commences to run from the day injury or damage is sustained."[53] "Damage is considered to have been sustained, within the meaning of the article, only when it has

---

[49] Phillips v. ABB Combustion Eng'g, Inc., No. 13–594, 2013 WL 3155224, at *2 (E.D. La. June 19, 2013).

[50] Murungi v. Tex. Guaranteed, 646 F. Supp. 2d 804, 811 (E.D. La. 2009).

[51] Doc. 5 at 3–9; Doc. 12 at 4–12.

[52] Doc. 8 at 4–13; Doc. 13 at 5–9.

[53] LA. CIV. CODE art. 3492; *see also* Brown v. R.J. Reynolds Tobacco Co., 52 F.3d 524, 527 (5th Cir. 1995) (quoting LA. CIV. CODE art. 3492).

manifested itself with sufficient certainty to support accrual of a cause of action."[54] Similarly, survival and wrongful death actions are subject to a prescriptive period of one year from the date of death.[55]

Here, Plaintiff filed suit on April 26, 2021.[56] Plaintiff's Amended Complaint states that Mrs. Fortado died from breast cancer on September 26, 2018 but fails to allege the date of her diagnosis.[57] Nonetheless, because she died in 2018, her diagnosis must have predated the April 26, 2020 cutoff required to render this suit timely. Accordingly, unless the one-year period was suspended or another exception applies, Plaintiff's claims have prescribed. Plaintiff does not dispute this proposition, but he argues that the prescriptive period was suspended under *contra non valentem*.

"[O]nce it is shown that more than a year has elapsed between the time of the tortious conduct and the filing of a tort suit, the burden shifts to the plaintiff to prove either suspension, interruption, or some exception to prescription[.]"[58] "The doctrine of *contra non valentem* was created by the Louisiana courts as an exception to the general rules of prescription."[59] "This doctrine suspends the prescriptive period under certain circumstances, including situations in which the cause of action is not known or reasonably knowable by the plaintiff, even though his ignorance is not induced by the

---

[54] Cole v. Celotex Corp., 620 So. 2d 1154, 1156 (La. 1993) (citing McCray v. N.E. Ins. Co., 579 So. 2d 1156 (La. App. 2 Cir. 1991)).
[55] LA. CIV. CODE arts. 2315.1(A), 2315.2(B).
[56] Doc. 8 at 2.
[57] Doc. 2, ¶¶ 10, 54.
[58] Terrebonne Par. Sch. Bd. v. Mobil Oil Corp., 310 F.3d 870, 877 (5th Cir. 2002).
[59] Kling Realty Co. v. Chevron USA, Inc., 575 F.3d 510, 517 (5th Cir. 2009).

defendant."[60] This exception to prescription, sometimes known as the "discovery rule," "creates a small opening, not a gaping hole, and so it 'only applies in exceptional circumstances.'"[61] Nevertheless, "[c]ourts assessing the applicability of *contra non valentem* must focus on the reasonableness of the tort victim's action or inaction."[62]

"Prescription commences when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort."[63] This requisite knowledge is not de minimis: "There must be knowledge of the tortious act, the damage caused by the tortious act, and the causal link between the act and the damage before one can be said to have 'constructive notice' of one's cause of action."[64] Indeed, "[a] prescriptive period will begin to run even if the injured party does not have actual knowledge of facts that would entitle him to bring a suit as long as there is constructive knowledge of same."[65]

How to define constructive knowledge is key to any *contra non valentem* analysis. The Louisiana Supreme Court has stated that "[c]onstructive knowledge is whatever notice is enough to excite attention and put the injured

---

[60] *Ellis*, 2022 WL 1719196, at *3 (citing Renfroe v. State ex rel. Dept. of Transp. & Dev., 809 So. 2d 947, 953 (La. 2002)).

[61] Hayes v. United States, No. 17-3841, 2018 WL 705876, at *3 (E.D. La. Feb. 5, 2018) (Africk, J.) (quoting *Renfroe*, 809 So. 2d at 953).

[62] *Ellis*, 2022 WL 171196, at *3 (citing Griffin v. Kinberger, 507 So. 2d 821, 824 n.2 (La. 1987)); *see also* Jordan v. Emp. Transfer Corp., 509 So. 2d 420, 423 (La. 1987) ("When prescription begins to run depends on the reasonableness of a plaintiff's action or inaction.").

[63] Guerin v. Travelers Indem. Co., 296 So. 3d 625, 629 (La. App. 1 Cir. 2020) (citing Campo v. Correa, 828 So. 2d 502, 510 (La. 2002)).

[64] Ducre v. Mine Safety Appliances, 963 F.2d 757, 760 (5th Cir. 1992) (quoting Knaps v. B & B Chem. Co., 828 F.2d 1138, 1139 (5th Cir. 1987)).

[65] *Campo*, 828 So. 2d at 510.

party on guard and call for inquiry."[66] "Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead," and therefore "is sufficient to start running of prescription."[67] This language derives from a 1970 state supreme court decision characterizing constructive notice as follows:

> Whatever is notice enough to excite attention and put the owner on his guard and call for inquiry is tantamount to knowledge or notice of everything to which inquiry may lead and such information or knowledge as ought to reasonably put the owner on inquiry is sufficient to start the running of prescription.[68]

Subsequently, however, the Louisiana Supreme Court distanced itself from this language: "[S]ubsequent decisions . . . have refined that language to emphasize that the proper focus is on the reasonableness of the tort victim's s [sic] action or inaction."[69] Indeed, "the ultimate issue in determining whether a plaintiff had constructive knowledge sufficient to commence a prescriptive period is the reasonableness of the plaintiff's action or inaction in light of his education, intelligence, and the nature of the defendant's conduct."[70] Especially relevant in cases of latent diseases or conditions such as this one,

---

[66] *Id.* at 510–11.

[67] *Id.* at 511 (citations omitted).

[68] Cartwright v. Chrysler Corp., 232 So. 2d 285, 287 (La. 1970). The *Campo* case cites to *Ledet v. Miller*, 459 So. 2d 202 (La. App. 3 Cir. 194), *writ denied*, 453 So. 2d 603 (La. 1985), which cites to *Cartwright*. *See Campo*, 828 So. 2d at 511 (citing *Ledet*); *Ledet*, 459 So. 2d 202, 204 (citing *Cartwright*).

[69] *Griffin*, 507 So. 2d at 824 n.2.

[70] Marin v. Exxon Mobil Corp. 48 So. 3d 234, 246 (La. 2010) (first citing *Campo*, 828 So. 2d at 511; and then citing *Griffin*, 507 So. 2d 821); *see also* Lennie v. Exxon Mobil Corp., 251 So. 3d 637, 645 (La. App. 5 Cir. 2018) (quoting *Marin*, 48 So. 3d at 246); Guerin v. Travelers Indem. Co., 296 So. 3d 625, 629 (La. App. 1 Cir. 2020).

"the question is whether, in light of plaintiff's own information and the diagnoses he received, the plaintiff was reasonable to delay in filing suit."[71]

The question before the Court is whether Plaintiff's wife's cancer diagnosis and subsequent death qualify as constructive knowledge of his survival and wrongful death actions against Defendants. If so, then *contra non valentem* cannot save his otherwise untimely claims. Plaintiff filed suit on April 26, 2021, and Mrs. Fortado died in 2018, meaning her diagnosis predated the April 26, 2020 cutoff date for prescription. Without the suspensive effect of *contra non valentem* operating until at least the cutoff date, Plaintiff's claims have prescribed.

In support of the inapplicability of *contra non valentem*, Defendants argue that "Louisiana jurisprudence makes clear that a medical diagnosis, in and of itself, constitutes constructive notice of a cause of action."[72] Because prescription commences upon actual or constructive notice, and a diagnosis qualifies as constructive notice according to Defendants, prescription began to run well before the cutoff and Plaintiff's claims have prescribed.

The key premise in Defendants' position is that a diagnosis of cancer always constitutes constructive notice and thereby always starts the running of prescription. If this premise were true, however, then Mr. and Mrs. Fortado's lack of inquiry following the diagnosis of breast cancer should be irrelevant. But Defendants make much of Plaintiff and his decedent's failure to inquire

---

[71] Cole v. Celotex Corp., 620 So. 2d 1154, 1157 (La. 1993) (citing *Knaps*, 828 F.2d 1138).

[72] Doc. 5-1 at 6; Doc. 12-1 at 11 ("Under Louisiana law, a cancer diagnosis is constructive notice sufficient to excite attention and call for further inquiry.").

into the cause of her cancer.[73] If a diagnosis is per se constructive notice, however, then that failure is inconsequential; the law is clear that prescription commences upon actual or constructive notice.[74] This inconsistency casts doubt on Defendants' key premise.

The mistake in Defendants' *contra non valentem* analysis is apparent in their argument that "[t]he allegations in Plaintiff's First Amended Complaint do not establish that Mr. or Mrs. Fortado made any inquiry into the cause of Mrs. Fortado's cancer after diagnosis, and thus they must be charged with the constructive knowledge *of the cause of her diagnosis*."[75] Faced with this same reasoning in a case with one of Plaintiff's former co-plaintiffs, Judge Africk recognized that the plaintiff's failure to inquire upon diagnosis should charge her with constructive knowledge *of whatever information a reasonable inquiry would unearth*, which is not necessarily the truth.[76] On this view, a diagnosis is not necessarily constructive notice.[77] Rather, upon being diagnosed, a

---

[73] Doc. 5-1 at 8–9; Doc. 12-1 at 9–11.

[74] *See Guerin*, 296 So. 3d at 629.

[75] Doc. 12-1 at 9 (emphasis added).

[76] Jones v. Evonik Corp., No. 22-cv-1522, 2022 WL 3226755, at *6 (E.D. La. Aug. 10, 2022) (Africk, J.) ("Accordingly, even if plaintiff's diagnosis triggered a duty to inquire further, the Court can only deem plaintiff to know what a reasonable inquiry would have revealed— which, according to the pleadings, is nothing with respect to the Facility's emissions."); *see also Marin*, 48 So. 3d at 246 ("[K]nowledge sufficient to start the running of prescription 'is the acquisition of sufficient information, which, if pursued, will lead to the true condition of things.'") (quoting Young v. Int. Paper Co., 155 So. 231 (La. 1934)); In re Taxotere (Docetaxel Prods. Liab. Litig., 995 F.3d 384, 394 (5th Cir. 2021) ("Appellants made no inquiry, and they are charged with knowledge of all that a reasonable inquiry would have revealed.").

[77] *See* Wells v. Zadeck, 89 So. 3d 1145, 1151 (La. 2012) ("According to *Marin*, 'the ultimate issue in determining whether a plaintiff had constructive knowledge sufficient to commence a prescriptive period is the reasonableness of the plaintiff's action or inaction in light of his education, intelligence, and the nature of the defendant's conduct.'") (quoting *Marin*, 48 So. 3d at 246); Butler v. Denka Performance Elastomer, L.L.C., 16 F.4th 427, 439 (5th Cir. 2021)

reasonable plaintiff inquires into the underlying cause, and thus if the actual plaintiff fails to do so, then actual knowledge and constructive knowledge diverge.[78] At that point, the Court must ask what an inquiry into the cause of the diagnosis would uncover, because if the answer is enough information to ascertain the cause of action, then prescription would indeed run at the time of diagnosis. But Defendants' position is effectively that a post-diagnosis inquiry must necessarily yield such information. This Court finds no reason to adopt this position, however. Prescription does not run until a plaintiff has "constructive notice of the tortious act, the damage caused by the tortious act, and the causal link between the act and the damage," and an inquiry into a diagnosis often can but need not necessarily reveal as much.[79]

Defendants contend that their position is supported by caselaw, but as Judge Africk recognized, "Few cases consider whether *contra non valentem* applies in cases wherein an individual fails to reasonably inquire as to the cause of her condition, but wherein such an inquiry would have been futile."[80] Defendants cite the cases of *Tenorio*, *Lennie*, *Guerin*, and *Butler* in support of their argument about diagnosis as per se constructive notice, but those cases

---

("Louisiana courts consistently consider 'the reasonableness of a plaintiff's action or inaction' based on the position she is in—including the information known or otherwise available to her at the time."); *Cole*, 620 So. 2d at 1157 ("[T]he question is whether, in light of plaintiff's own information and the diagnoses he received, the plaintiff was reasonable to delay in filing suit.").

[78] The Court need not answer whether a diagnosis *always* triggers a duty to inquire such that the reasonable plaintiff does so in all cases. Here, Plaintiff alleges that had he or Mrs. Fortado inquired, they would not have discovered the alleged truth because no one knew the truth at that time.

[79] *Ducre*, 963 F.2d at 760.

[80] *Jones*, 2022 WL 3226755, at *7.

can be reasonably read as instances in which the court found that an inquiry following a diagnosis would *not* have been futile.[81] Accordingly, *those* diagnoses served as constructive notice, but the courts said nothing of them necessarily serving as notice simply by virtue of being diagnoses.

Judge Africk's argument in support of his position based on the Fifth Circuit's recent case *In re Taxotere (Docetaxel) Products Liability Litigation* is also persuasive, and the Court adopts his reasoning here.[82] In further support, the Court notes its position's harmony with the guiding principle of *contra non valentem*: "When prescription begins to run depends on the reasonableness of a plaintiff's action or inaction."[83] By contrast, Defendants' view is noticeably discordant with this principle. By focusing on the Fortados' lack of inquiry, Defendants effectively concede that diagnosis alone is not necessarily constructive notice. By emphasizing the absence of any inquiry, their position is effectively that a diagnosis-followed-by-no-inquiry *is* constructive notice, but a diagnosis-followed-by-an-unsuccessful-inquiry is *not* constructive notice.[84] It would be a perplexing legal doctrine indeed that treats differently the plaintiff who inquires but gets nowhere and the plaintiff who does not bother inquiring under the same circumstances. These two individuals both happen to act

---

[81] Doc. 5-1 at 6 (first citing Tenorio v. Exxon Mobile Corp., 170 So. 3d 269 (La. App. 5 Cir. 2015), *writ denied*, 178 So. 3d 149 (La. 2015); then citing Lennie v. Exxon Mobile Corp., 251 So. 3d 637 (La. App. 5 Cir. 2018); and then citing *Guerin*, 296 So. 3d 625); Doc. 12-1 at 8 (citing Butler v. Denka Performance Elastomer, LLC, 16 F.4th 427, 439–40 (5th Cir. 2021))

[82] *Jones*, 2022 WL 3226755, at *7.

[83] *Jordan*, 509 So. 3d at 423; *see also* cases cited *supra* note 77.

[84] *See, e.g.*, Doc. 5-1 at 9 n.33 (arguing that one of Plaintiff's former co-plaintiffs, Joan LeBeouf, is entitled to *contra non valentem* because she discussed a potential cause of her cancer with her physician after being diagnosed).

reasonably and thus should stand in the same position as far as *contra non valentem* is concerned.

Accordingly, this Court must consider whether, in light of Plaintiff's allegations, an inquiry into the cause of Mrs. Fortado's breast cancer at the time of her diagnosis and death in 2018 would have apprised Plaintiff of his claims. Plaintiff alleges that the EPA released the results of the 2014 NATA in August 2018.[85] These results were not communicated to any lay persons in St. John the Baptist Parish.[86] Plaintiff did not know, among other things, that the Facility emitted EtO until he received an advertisement in the mail from the Voorhies Law Firm on or after April 28, 2020.[87] Plaintiff filed suit on April 26, 2021.[88] The first public community outreach meeting regarding the Facility's EtO emissions was held on August 21, 2021.[89] Prior to that meeting, no governmental agency, nor any Defendant, took any steps to inform local residents that the Facility emitted EtO or that the levels of EtO emissions from the Facility increased residents' risk of developing cancer, despite clear instructions from the EPA Office of Inspector General.[90]

Thus, the only piece of information that might have apprised Plaintiff of his cause of action was a single report from 2018. Like Judge Africk, this Court finds that given Plaintiff's allegations, this sole report does not suffice to

---

[85] Doc. 2 at ¶ 41.

[86] *Id.* at ¶ 42.

[87] *Id.* at ¶ 55.

[88] Doc. 8 at 2.

[89] Doc. 2 at ¶ 43.

[90] *Id.* The EPA Office of Inspector General must have recognized that this information must necessarily be disseminated to be accessible to the people of the community.

establish constructive notice of his causes of action.[91] Plaintiff has alleged that the results of this report were not communicated to residents of his parish, that he and his wife were "computer illiterate" with little relevant educational background, and that they were not even aware of the Facility's emissions, much less EtO itself, at the time.[92] In light of these allegations, a reasonable inquiry—conducted at any time between before 2018, when Mrs. Fortado was diagnosed, and April 2020, when the Voorhies Law Firm sent mailers about this issue to members of the public—would not have revealed sufficient facts to put Plaintiff on constructive notice. Accordingly, Plaintiff's claims are not prescribed.[93]

## II.   Negligence

Louisiana law provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."[94] Louisiana courts conduct a duty-risk analysis to determine whether to impose liability under article 2315.[95] Liability requires satisfaction of five elements: (1) the defendant had a duty to conform his conduct to a specific standard; (2)

---

[91] *Jones*, 2022 WL 3226755, at *6 n.44 (first citing Frank v. Shell Oil Co., 828 F. Supp. 2d 835, 845 (E.D. La. 2011) (concluding that plaintiff, as a lay person outside of the medical and scientific fields, could not reasonably be expected to be aware of scientific and industry publications regarding the cancer-causing propensities of benzene); and then citing *In re Taxotere*, 995 F.3d at 393–94 (concluding that news media coverage, online advocacy by a group of individuals who developed permanent hair loss after using the relevant chemotherapy drug, and multiple scientific studies, together, were sufficient to give rise to constructive notice)).

[92] Doc. 2 at ¶¶ 43–43, 55.

[93] Even if *contra non valentem* did not apply, the Court would still find—as Judge Vance did—that Plaintiff's own individual claims against Evonik did not prescribe because Plaintiff has sufficiently alleged continuing torts by Evonik. *Ellis*, 2022 WL 1719196, at *9.

[94] LA. CIV. CODE art. 2315(A).

[95] Lemann v. Essen Lane Daiquiris, Inc., 923 So. 2d 627, 632–33 (La. 2006).

the defendant's conduct failed to conform to the appropriate standard; (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages.[96]

### A.    Duty

Defendants both argue that Plaintiff has failed to sufficiently plead an applicable standard of care with which they should have complied.[97] Before severing the underlying case into 14 separate ones, Judge Vance agreed with this argument in light of the Fifth Circuit's decision in *Butler v. Denka Performance Elastomer, LLC*.[98] In *Butler*, the court considered the plaintiff's claims arising from allegedly unsafe emissions of chloroprene in her community.[99] The lower court had dismissed the plaintiff's claims, and as to whether she adequately alleged a duty under Louisiana law, the Fifth Circuit explained:

> Butler asserts that Denka violated Louisiana's general duty "to use reasonable care to avoid injury to another." *Rando v. Anco Insulations, Inc.,* 16 So. 3d 1065, 1086 (La. 2009). She says Denka's chloroprene emissions—untethered from any particular emissions threshold—are nonetheless unreasonably excessive.
>
> . . . Butler's retreat to generalized grievances is unavailing. While Louisiana law does impose a "universal duty" on defendants in a negligence action to use "reasonable care," *Rando*, 16 So. 3d at 1086, plaintiffs are still required to assert a "specific standard" of care. *See Lemann*, 923 So. 2d at 633. The inquiry into a defendant's

---

[96] *Id.* at 633.
[97] Doc. 5-1 at 9–13; 12-1 at 13–15.
[98] *Ellis*, 2022 WL 1719196, at *9–10 (citing *Butler*, 16 F.4th at 432).
[99] *Butler*, 16 F.4th at 432.

particular duty "is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty." *Id.; accord Boykin v. La. Transit Co.*, 707 So. 2d 1225, 1230 (La. 1998) (emphasizing that in a "proper duty-risk analysis" the court should first identify "the duty imposed upon the defendant by statute or rule of law"). "Whether a legal duty exists, and the extent of that duty, depends on the facts and circumstances of the case, and the relationship of the parties." *Joseph v. Dickerson*, 754 So. 2d 912, 916 (La. 2000).

Here, Butler relies not on the EPA, OSHA, or other agencies' recommended emissions thresholds but on generalized pronouncements that Denka has violated its duty to take "reasonable care." *Yet, Butler points to no "statutory," "jurisprudential," or any other source of law— and we have likewise found none—in which such generalized references to "excessive emissions," "acceptable risk threshold," and "unreasonably dangerous emissions," constitutes a sufficient legal duty to support a negligence . . . claim.*[100]

Judge Vance determined that the original complaint suffered from this same defect and accordingly dismissed the plaintiffs' negligence claims without prejudice, granting leave to amend.[101]

In his Amended Complaint, Plaintiff alleges that Defendants have a duty to conform to the standard of care set forth in Louisiana Administrative Code, 33:III ("Environmental Regulatory Code").[102] More specifically, Plaintiff cites L.A.C. 33:III.905, which provides:

[T]o aid in controlling the overall levels of air contaminants into the atmosphere, air pollution control facilities should be installed

---

[100] *Ellis*, 2022 WL 1719196, at *10 (quoting *Butler*, 16 F.4th at 443–46) (emphasis added).
[101] *Id.* at *11.
[102] Doc. 2 at ¶¶ 48–49.

> whenever practically, economically, and technologically feasible. When facilities have been installed on a property, they shall be used and diligently maintained in proper working order whenever any emissions are being made which can be controlled by the facilities, even though the ambient air quality standards in affected areas are not exceeded.

Plaintiff also cites to L.A.C. 33:III.2121 ("Fugitive Emission Control"), which contains monitoring, inspection, leak detection, and leak repair requirements that apply to the Facility.[103] Accordingly, Plaintiff alleges:

> Pursuant to the [Environmental Regulatory] Code, the Defendants have a duty to control the overall emissions of EtO into the atmosphere through installing and diligently maintaining emissions control systems and equipment at "point sources" where emissions are planned to occur and through a LDAR program to control unplanned fugitive emissions. Stringent LDAR programs that effectively monitor for and result in quick repairs to leaks and other sources of unplanned fugitive emissions are mandated.[104]

Plaintiff further argues, "Emission controls were to be installed and diligently maintained for the purpose of protecting public health, safety, and welfare regardless of whether the emissions are within permit limits and regulatory ambient air quality standards."[105]

As another section of this Court has found, these amended allegations are "a far-cry from the *Butler* plaintiff's allegations and the allegations in the unsevered Original Plaintiffs' complaint that generally alluded to

---

[103] *Id.* at ¶ 49.
[104] *Id.*
[105] Doc. 8 at 15.

'unreasonably excessive emissions.'"[106] For the same reasons stated by Judges Barbier, Africk, and Fallon, this Court finds that Plaintiff's Amended Complaint sufficiently states a specific standard of care.[107]

### B. Breach

Defendants also argue that Plaintiff has failed to sufficiently allege that their conduct failed to conform to the applicable standard of care.[108] On this same point, the Court again finds Judges Africk and Barbier's reasoning persuasive and adopts the same here.[109] Plaintiff has sufficiently alleged the breach element.

As an alternative to dismissal, Evonik seeks a more definite statement "identify the alleged 'unauthorized' or unpermitted emissions from Evonik's [Facility] that form the basis of Plaintiff's lawsuit."[110] Evonik submits that Plaintiff's Amended Complaint

> is so vague and ambiguous that Evonik is not able to determine what unauthorized or unpermitted releases of EtO – other than two such releases in 2012 and 2013 that cannot alone form the

---

[106] Foster v. Evonik Corp., No. 22-1519, 2022 WL 3214406 (E.D. La. Aug. 9, 2022) (Barbier, J.).

[107] *Jones*, 2022 WL 3226755, at *7–9 (Africk, J.); *Foster*, 2022 WL 3214406, at *5–8 (Barbier, J.); LeBouef v. Evonik Corp., No. 22-1523, 2022 WL 3159920, at *6–8 (E.D. La. Aug. 8, 2022) (Barbier, J.); Tassin v. Evonik Corp., No. 22-1528, Doc. 18 at 11–14 (E.D. La. Aug. 8, 2022) (Fallon, J.).

[108] Doc. 5-1 at 12–13; Doc. 12-1 at 15–18.

[109] *See Jones*, 2022 WL 3226755, at *9–11; *Foster*, 2022 WL 3214406, at *8–9; *LeBouef*, 2022 WL 3159920, at *8–9.

[110] Doc. 12-1 at 19.

basis of any continuing tort – make up the basis for Plaintiff's claims such that Evonik is unable to defend against the same.[111]

As stated above, a court should only grant a motion for more definite statement when the complaint is "so excessively vague and ambiguous to be unintelligible and as to prejudice the defendant seriously in attempting to answer it."[112] Plaintiff's Amended Complaint does not suffer from this deficiency. Accordingly, the Court denies Evonik's Rule 12(e) request.

## III. Nuisance

Judge Vance previously concluded that the original plaintiffs properly stated a claim for nuisance in their original complaint, and that an amendment was unnecessary. Evonik once again argues that Plaintiff's nuisance allegations are too vague and thus fail to adequately support the negligence element incorporated into the claim.[113] In addressing this argument, Judge Vance concluded that it

> conflates the general negligence standard under article 2315 with the distinct negligence requirement for a nuisance claim under Louisiana's vicinage articles, which deal specifically with a proprietor's relationship to his neighbors . . . [and] unlike their

---

[111] *Id.*

[112] *Phillips*, 2013 WL 3155224, at *2.

[113] Doc. 12-1 at 19–24.

article 2315 general-negligence claims, plaintiffs' nuisance claims
do not require an allegation of a separate source of duty.[114]

Like Judges Africk and Barbier, this Court concurs with Judge Vance's reasoning, and it concludes that Plaintiff has stated a claim for nuisance.[115]

## CONCLUSION

For the foregoing reasons, Shell's Motion (Doc. 5) and Evonik's Motion (Doc. 12) are **DENIED**.

New Orleans, Louisiana this 22th day of September, 2022.

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**

---

[114] *Ellis*, 2022 WL 1719196, at *13.
[115] *See Jones*, 2022 WL 3226755, at *11; *Foster*, 2022 WL 3214406, at *9; *LeBouef*, 2022 WL 3159920, at *9.